**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Steven Wirth
Peter O. Larsen (admitted *pro hac vice*)
Raye Elliott (admitted *pro hac vice*)
Stefi George (admitted *pro hac vice*)
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Telephone: (813) 223-7333
Facsimile:  (813) 223-2837
Email:  steven.wirth@akerman.com
   peter.larsen@akerman.com
   raye.elliott@akerman.com
   stefi.george@akerman.com

*Counsel to the Plan Administrator*

| | |
|---|---|
| In re:<br><br>20230930-DK-BUTTERFLY-1, INC. f/k/a Bed Bath & Beyond, Inc., *et.al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 23-13359 (VFP)<br><br>(Jointly Administered) |
| MICHAEL GOLDBERG, as Plan Administrator for 20230930-DK-BUTTERFLY-1, INC. f/k/a Bed Bath & Beyond, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>INTERNAL REVENUE SERVICE, an agency of the United States of America,<br><br>    Defendant. | Adversary Proceeding No. 24-01533 (VFP) |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

[1] The last four digits of Debtor Bed Bath & Beyond, Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtor's claims and noticing agent at https://restructuring.ra.kroll.com/bbby/.

Plaintiff, Michael Goldberg as Plan Administrator (the "Plan Administrator" or "Plaintiff")
for 20230930-DK-Butterfly, Inc. f/k/a Bed Bath & Beyond, Inc. and affiliates ("Debtor or
Debtors"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 56, as incorporated by
Fed. R. Bankr. P. 7056, moves for final summary judgment against Defendant, Internal Revenue
Service, an agency of the United States of America ("IRS" or "Defendant") on all counts of
Plaintiff's Amended Complaint. In support of this Motion, Plaintiff would show the Court as
follows:

## PRELIMINARY STATEMENT

The Debtor formerly known as Bed Bath & Beyond, Inc. ("BBB") was a large leading
national retailer with retail stores and e-commerce operations throughout the United States. This
case involves BBB's recovery of overpayments of income tax for its tax years ending March 3,
2018 and March 2, 2019 in the amounts of $13,637,620 and $9,352,953, respectively (plus accrued
interest) (the "Refund Claims"). BBB filed the Refund Claims based on its calculations of the
amount of the charitable contribution deductions to which BBB was entitled for those years for
substantial contributions of inventory to charity.

In the course of its business, BBB routinely donated substantial amounts of inventory to
charity in order to support local communities, to address needs in local communities, and for other
charitable reasons, and often used inventory that was returned by customers where the original
packaging was opened but the product was unused.  In those cases, BBB had two primary options
for returned inventory in new condition: throw the item away or donate the item to charity.

Under Section 170 of the Internal Revenue Code (the "Code"), donations of retail inventory
to charities can be deducted for income tax purposes based on the amount paid for the item or, if

85262851;1

certain conditions are met, the donation can be deducted in a higher amount (the so-called "enhanced deduction"). Thus, there are two ways to calculate the same deductible item. For example, if BBB paid $50 wholesale for an item, sold the item for a retail price of $100, and the customer subsequently returned the item in new condition, BBB could dispose of or throw the item away, which would entitle BBB to a $50 deduction. Alternatively, BBB could donate the item to charity, which would entitle BBB to either a $50 deduction (regular deduction) or a $75 deduction (enhanced deduction).

If BBB had decided to throw the items in the trash, it is undisputed that BBB would have been entitled to a deduction for the cost of those items. However, whenever the condition of the inventory met donation standards, BBB always chose to donate the items to charity to benefit the poor, needy and ill and BBB claimed a charitable contribution deduction for the donation (based on BBB's cost basis or amount paid to originally acquire the property). Indeed, during the periods in issue, BBB donated items of inventory to the poor, needy and ill with an estimated fair market value totaling $210,000,000.

On its originally filed income tax returns for 2018 and 2019, BBB deducted the donated inventory using the calculation set forth in Section 170(e)(3) of the Code (the enhanced deduction). The enhanced deduction was added to the Code to provide a calculation that made it financially more advantageous for companies to donate inventory rather than throw away the inventory into the trash. This recognized and encouraged donation of inventory items in order to benefit the needy and reduce waste and environmental impact. Recognizing that retailers would likely incur additional handling and operational management costs associated with implementing a donation process, the enhancement stood to offset at least some of those costs.

In practice, however, the IRS recognized that the enhanced deduction was not always incentivizing as intended. Thus, the IRS issued Notice 2008-90, https://www.irs.gov/pub/irs-drop/n-08-90.pdf (last accessed January 29, 2026) (the "Notice"), confirming the IRS's stated position that taxpayers may compute the deduction using either the regular deduction (Section 170(e)(1)) *or* the enhanced deduction (170(e)(3)), as fairness dictates, so that taxpayers are incentivized to donate inventory, and rewarded for doing so. The purpose of the Notice is to ensure that taxpayers can receive a full deduction of the cost basis of charitable contributions by adjusting its cost of goods sold when the taxpayer cannot fully benefit from the enhanced deduction so that one way or another, the taxpayer receives the benefit and does not choose to destroy or dispose of the goods rather than donating them. Further, nothing in the Notice, the Code, or the regulations restricts such treatment to an originally filed return.

This is exactly what BBB did. After filing its 2018 and 2019 tax returns, BBB amended its 2018 and 2019 returns pursuant to the Notice by computing the charitable deductions on a cost basis – as an adjustment to its cost of goods sold (under Section 170(e)(1) of the Code) in accordance with the guidance provided in IRS Notice 2008-90 – rather than on the enhanced basis. The IRS, notwithstanding BBB's clear right under the Code to compute its taxes under either computational formula and the provisions of IRS Notice 2008-90, denied the Refund Claims in full and disallowed 100% of all charitable contribution deductions for these years, placing BBB in a worse position than had it thrown all of the donated items into a landfill.

At the hearing on Defendant's Motion to Dismiss in this case, the IRS admitted that if BBB had taken this same position on its originally filed tax returns, the IRS would have allowed the charitable deductions (in costs of goods sold) that BBB claimed on the amended returns. The IRS

based its position on its contention that the amended returns were not valid on their face. However, this Court determined that the Refund Claims were in fact valid on their face and denied the IRS's Motion to Dismiss.

Thus, there remains no possible basis on which to deny these legitimate charitable contribution deductions. Plaintiff seeks summary judgment on all counts of his Amended Complaint, as there are no material facts in dispute, and Plaintiff is entitled to judgment as a matter of law. For the reasons set forth herein, none of the defenses raised by Defendant bar such relief, as (1) the Doctrine of Election does not apply; and (2) the IRS's position on Reg. §1.170A-1(c)(4) is based on a misreading of that regulation, a misreading that has no support in the Code, regulations or legislative history. Accordingly, this Court should grant this Motion in full and order the relief requested by Plaintiff in its Amended Complaint.

## I.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.     General Case Background

1.      On April 23, 2023 (the "Petition Date"), the Debtors filed a voluntary petition for relief (the "Petition") (Doc. 1) under Chapter 11 of the Bankruptcy Code. The Debtors continued to operate their businesses and manage their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code until the Effective Date of the Plan (each, as defined below). No trustee or examiner has been appointed in this case.

2.      On September 14, 2023, the Court entered the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates* [Doc.

2172], confirming the *Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates* (Doc. 2160) (as amended, the "Plan").

3.        On September 29, 2023, the effective date of the Plan occurred (the "Effective Date"). *See* Docket No. 2311. On the Effective Date, the Plan Administrator became the sole representative of the Debtors and assumed responsibility for, *inter alia,* investigating, prosecuting and compromising any and all of the Debtors' claims and causes of action. *See, e.g.,* Plan at Art. IV.F, VII.A.

**B.        BBB's Charitable Donation Program**

4.        Prior to the commencement of these bankruptcy cases, BBB was a leading retailer that operated retail stores and e-commerce websites throughout the United States. (Declaration of Laura Crossen ("Crossen Decl.") filed contemporaneously with this Motion at ¶ 4).

5.        BBB regularly donated unsold merchandise to charitable organizations benefiting the poor, needy and ill. (Crossen Decl. ¶ 5). BBB had written operating procedures for its merchandise charitable contribution program which were utilized by all retail stores. (*Id.*) A copy of these written procedures are attached to the Crossen Declaration as Exhibit A.

6.        In 2001, BBB formed a partnership with Good360 (formerly known as Gifts In Kind International), a non-profit organization based in Alexandria, Virginia, to formalize a charitable donation program that enabled BBB to provide product donations to those most in need. (Crossen Decl. ¶ 6). Through this program, BBB donated items from participating stores to local 501(c)(3) charities across the United States, Canada and Puerto Rico. (*Id.*) These donations provided relief and assistance to individuals for situations such as relief for victims of natural

disasters, transitional housing needs for families in crisis, needs for youth in low income situations

and support for mentally and physically disabled individuals. (*Id*.).

7.      BBB entered into an agreement with Good360 to manage its charitable donation

program. (Crossen Decl. ¶ 7). A sample copy of the agreement with Good360 is attached to the

Crossen Declaration as Exhibit B. Good360 would coordinate with local charities and BBB's retail

stores for the pickup and delivery of donated goods. (*Id*.) A sample retail donation authorization

form reflecting a sample donation of merchandise to the National Veterans Foundation in Los

Angeles, California is attached as Exhibit C to the Crossen Declaration.

8.      According to BBB's 2018 and 2019 Corporate Responsibility Reports, which were

provided to its shareholders and published on its website, BBB estimated its product donations to

have a fair market value of $170 million and $40 million, respectively. (Crossen Decl. ¶ 8). BBB

was recognized by Good360 for its outstanding corporate citizenship and effective product

philanthropy. (*Id*.)

9.      The items BBB donated consisted of two groups of merchandise: (i) items that had

been processed through the return-to-vendor ("RTV") program or as a freight claim; and (ii) "as

is" merchandise placed in the sellable category that did not sell in a 14-day period.  (Crossen Decl.

¶ 9). In both groups, prior to donating, the merchandise was properly removed from inventory and

reclassified in another account on BBB's books, ensuring it was not recorded as opening inventory.

(*Id*.)

10.      As a result, all items processed through the RTV or freight claim process were

marked out of stock as soon as they were deemed non-saleable merchandise, and therefore such

items were not included in opening inventory even if they were still physically present in BBB

stores or storage at year-end. (Crossen Decl. ¶ 10).

**C.     BBB's Original Tax Returns**

11.     BBB timely filed Form 1120, *U.S. Corporation Income Tax Return* (the "2018 Tax

Return") for its taxable period ending March 3, 2018 (the "2018 Tax Year"). (Crossen Decl. ¶ 11).

12.     BBB timely filed Form 1120, *U.S. Corporation Income Tax Return* (the "2019 Tax

Return") for its taxable period ending March 2, 2019 (the "2019 Tax Year").  (Crossen Decl. ¶ 12)

The 2018 Tax Return and 2019 Tax Return are collectively referred to as the "Original Tax

Returns" and the 2018 Tax Year and 2019 Tax Year are collectively referred to as the "Tax Years".

13.     On the Original Tax Returns, BBB claimed enhanced charitable contributions

deductions for charitable contributions of inventory made during the Tax Years pursuant to §

170(e)(3) of the IRC. (Crossen Decl. ¶ 13). Due to the charitable contribution limitation of 10% of

taxable income, BBB was not able to fully deduct the charitable contributions it made on the

Original Tax Returns. (*Id*.)

14.     Prior to the Tax Years, the IRS conducted an examination of BBB's taxable year

ending February 28, 2016 (the "Prior Examination"), as a result of which the IRS and BBB entered

into a Memorandum of Understanding explained on Form 886-A pursuant to which the IRS

allowed the charitable contribution deductions subject to certain adjustments to the enhanced

valuation of BBB's charitable contributions for such taxable year.  (Crossen Decl. ¶ 14).

15.     As a result of the Prior Examination, the IRS reviewed BBB's current charitable

contribution deduction for the 2018 Tax Year and made corresponding adjustments to the return

to apply a similar valuation methodology to that agreed upon in the Prior Examination. (Crossen Decl. ¶ 15)

16.    The IRS adjusted the non-cash current charitable deduction by $10,130,982 for the 2018 Tax Year. (Crossen Decl. ¶ 16). The IRS made no further adjustments to BBB's current charitable contributions for these periods. (*Id.*)

**D.    BBB's Amended Returns/Refund Claims Filed With IRS**

17.    On December 15, 2022, BBB timely filed Form 1120X, *Amended U.S. Corporation Income Tax Return*, for the 2018 Tax Year, representing BBB's refund claim for that period (the "2018 Refund Claim"). (Crossen Decl. ¶ 17). A copy of the 2018 Refund Claim is attached to the Crossen Declaration as Exhibit D.

18.    On Form 1125-A (Cost of Goods Sold) attached to its 2018 Refund Claim, BBB increased its cost of goods sold in the amount of $85,157,520 to reflect the cost basis of donated inventory. The beginning inventory of $2,800,263,882 and purchases of $9,077,421,012 did not change. (Crossen Decl. ¶ 18 and Ex. D).

19.    The 2018 Refund Claim made a corresponding reduction of the charitable contribution deduction in the amount of $8,275,882. (Crossen Decl. ¶ 19 and Ex. D).

20.    The 2018 Tax Return and the 2018 Refund Claim confirm that the opening inventory was $2,800,263,882 and the inventory at the end of the year was $2,700,252,851. (Crossen Decl. ¶ 20 and Ex. D). Thus, BBB disposed (either by sale or donation) of substantially all of its inventory purchases during the 2018 Tax Year. (*Id.* )

21.    The 2018 Refund Claim sought a refund of overpaid income tax in the amount of $13,637,620, plus accrued interest (the "2018 Refund").  (Crossen Decl. ¶ 21 and Ex. D).

22.    The attachment to the 2018 Refund Claim stated, in relevant part:

Form 1120X, Page 1, Line 1 – Total Income:

The reduction in total income of $85,157,520 represents the cost of product donations that is currently deductible by Bed Bath & Beyond Inc. and Subsidiaries ("taxpayer") pursuant to the provisions of IRS Notice 2008-90.

* * *

The taxpayer is relying on Notice 2008-90 guidance that permits a taxpayer who makes donations during a taxable year, that qualify for the enhanced deduction under IRC Sec 170(e)(3), to elect whether to apply to some or all of such donations made during a taxable year, the special rules pursuant to IRC Sec. 170(e)(3) and the regulations thereunder (Treas. Reg. § 1.170A-4A) or, alternatively, apply the "general section 170 rules" in Treas. Reg. § 1.170A-1(c)(4) so that costs incurred in the year of contribution with respect to donated property, remain embedded in COGS (thereby increasing the COGS deduction and reducing income) and would be deductible under IRC §162.

(Crossen Decl. ¶ 22 and Ex. D, p. 4).

23.    On May 25, 2023, BBB timely filed Form 1120X, *Amended U.S. Corporation Income Tax Return*, for the 2019 Tax Year, representing BBB's refund claim for that period (the "2019 Refund Claim" and, together with the 2018 Refund Claim the "Refund Claims"). (Crossen Decl. ¶ 23). A copy of the 2019 Refund Claim is attached to the Crossen Declaration as Exhibit E.

24.    On Form 1125-A (Cost of Goods Sold) attached to its 2019 Refund Claim, BBB increased its cost of goods sold in the amount of $19,960,271 to reflect the cost basis of donated inventory. (Crossen Decl. ¶ 24 and Ex. E). The beginning inventory of $2,700,252,851 and purchases of $8,719,431,862 did not change. (*Id.*)

25.    The 2019 Refund Claim made a corresponding reduction of the charitable contribution deduction in the amount of $30,051,947. (Crossen Decl. ¶ 25 and Ex. E).

26.    The 2019 Tax Return and the 2019 Refund Claim confirm that the opening inventory was $2,700,252,851 and the inventory at the end of the year was $2,512,666,849.

(Crossen Decl. ¶ 26). Thus, BBB disposed (either by sale or donation) of substantially all of its inventory purchases during the 2019 Tax Year. (*Id.*)

27.     The 2019 Refund Claim sought refund of overpaid income tax in the amount of $9,352,953, plus accrued interest (the "2019 Refund" and, together with the 2018 Tax Refund, the "Refunds"). (Crossen Decl. ¶ 27).

28.     The attachment to the 2018 Refund Claim stated, in relevant part:

Form 1120X, Page 1, Line 1 – Total Income:

The reduction in total income of $19,960,271 represents the cost of product donations that is currently deductible by Bed Bath & Beyond Inc. and Subsidiaries ("taxpayer") pursuant to the provisions of IRS Notice 2008-90.

* * *

The taxpayer is relying on Notice 2008-90 guidance that permits a taxpayer who makes donations during a taxable year, that qualify for the enhanced deduction under IRC Sec 170(e)(3), to elect whether to apply to some or all of such donations made during a taxable year, the special rules pursuant to IRC Sec. 170(e)(3) and the regulations thereunder (Treas. Reg. § 1.170A-4A) or, alternatively, apply the "general section 170 rules" in Treas. Reg. § 1.170A-1(c)(4) so that costs incurred in the year of contribution with respect to donated property, remain embedded in COGS (thereby increasing the COGS deduction and reducing income) and would be deductible under IRC §162.

(Crossen Dec. ¶ 28 and Ex. E at p. 3).

29.     During its audit of the Refund Claims, the Debtor produced to the IRS the workpapers and financial records supporting the original and amended returns, which demonstrate unequivocally that any donated items were removed from cost of goods sold in the Original Tax Returns. (Crossen Decl. ¶ 29).

30.     The Refund Claims were filed to remove the enhanced benefit for the charitable contributions for donated inventory and instead claim the cost basis deduction. (Crossen Decl. ¶ 30).

31. The Refund Claims otherwise conformed to the valuation agreed upon between BBB and the IRS in the Prior Examination. (Crossen Decl. ¶ 31).

32. On March 26, 2024, the IRS issued two notices of disallowance (the "Notices of Disallowance"), disallowing the Refund Claims in full. (Crossen Decl. ¶ 32). Copies of the Notices of Disallowance are attached to the Crossen Declaration as Exhibit F.

33. According to the Notices of Disallowance, the IRS disallowed both Refund Claims because the "IRS believes that [Taxpayer] irrevocably elected the enhanced method for computing the charitable contribution deduction under IRC § 170(e)(3). Elective choices are binding after the period for filing expires and can only be changed thereafter with the consent of the Commissioner (*Pacific Nat'l Co. v. Welch*, 304 U.S. 191 (1938))." (Crossen Decl. ¶ 33 and Ex. F, p. 3). Additionally, according to the Notices of Disallowance, the IRS disallowed both Refund Claims because BBB did not provide sufficient facts to show that the merchandise donated to charity was acquired and donated in the same year. (*Id.* at p. 4).

34. As stated above, the IRS ***already reviewed*** the original 2018 Tax Return and 2019 Tax Return and only made minor adjustments to the enhanced valuation amount originally claimed charitable deductions. (Crossen Decl. ¶ 34). The IRS did not dispute that the goods donated by BBB qualified as charitable contributions under the Code. (*Id.*)

35. The statute of limitations for the assessment of additional taxes for the 2018 and 2019 tax years has expired. (Crossen Decl. ¶ 35).

**E.**    **Procedural Background**

36.    The Plan Administrator filed this adversary proceeding on August 16, 2024 against the IRS for turnover of the Refund Claims and a declaratory judgment that the Debtors are entitled to payment of the Refund Claims.

37.    On October 18, 2024, the IRS filed a motion to dismiss the Plan Administrator's Complaint (Doc. 14).

38.    Following the hearing conducted by this Court on November 13, 2024, the Court denied the Motion to Dismiss and determined with prejudice that the Refund Claims were valid claims (Doc. 24).

39.    On February 11, 2025, the Plan Administrator filed an Agreed Motion for Leave to File Amended Complaint to address some of the issues raised in the IRS's Motion to Dismiss (Doc. 30). The Court granted the Motion for Leave to File Amended Complaint by order dated March 4, 2025 (Doc. 33).

40.    The IRS filed its Answer to the Amended Complaint on April 9, 2025 (Doc. 37).

41.    On August 19, 2025, the Court entered a Mediation Order (Doc. 42) appointing Anthony Sodono as mediator and directing the parties to make a good faith attempt to settle this proceeding. The mediation was held on September 11, 2025. The mediation was unsuccessful.

## II.    MEMORANDUM OF LAW

**A.**    **Standard for Summary Judgment**

Federal Rule of Bankruptcy Procedure 7056 provides that summary judgment shall be granted if the record of the case shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The Supreme Court affirmed

85262851;1

the vitality of summary judgment as a method for the just, speedy and inexpensive disposition of cases. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Once the moving party identifies those portions of the record that demonstrate the absence of a genuine issue of material fact, any party opposing summary judgment must set forth specific facts showing a genuine issue for trial, and may not rely on mere allegations or denials. *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 256-57; *Martin v. Commercial Union Ins. Co.,* 935 F.2d 235, 238 (11 Cir. 1991).  If the record as a whole could not lead a rational finder of fact to find for the non-moving party, then there is no genuine issue of fact precluding summary judgment. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87. Where the factual context renders the non-moving party's position implausible, it must come up with more persuasive evidence than would otherwise be necessary to defeat summary judgment. *Id.* at 587.

Applying these principles to the instant case, this Court should enter summary judgment for the Plaintiff. The facts in this case are undisputed and resolution of the Plaintiff's claim for entry of a declaratory judgment on the validity, extent and entitlement of BBB to the Refund Claims is simply an application of the law to the facts of the case.

    **B.**    **The Refund Claims Should Be Allowed in Full**

        **1.**    **Debtor Properly Applied Section 170(e)(1) and IRS Notice 2008-90**

           **a.**    **Section 170(e)—the regular deduction**

Section 170 of the Code generally permits the deduction of charitable contributions made during a taxable year, subject to certain specific restrictions. One such restriction is in Section

170(e)(1), which operates to ensure that the amount of the deduction is limited generally to the taxpayer's basis in the property (which is typically the taxpayer's cost to purchase the property).

There are two different ways to calculate the deduction amount for the same donated item of property – Section 170(e)(1) (regular deduction) and 170(e)(3) (enhanced deduction), where Section 170(e)(1) operates as a mere adjustment to the cost of goods sold to account for the donated inventory and is limited to the basis in the property, and where Section 170(e)(3) provides for an increase of such deduction, in the form of an enhanced deduction. It is important to note that under either calculation, the taxpayer is entitled to the deduction for its donation of inventory; the difference lies merely in the computation of such deduction.

Section 170(e)(3) provides for a higher benefit than the ordinary rule set forth in Section 170(e)(1). The intent of both provisions, as illustrated by Notice 2008-90, is to reward taxpayers for donating instead of disposing of inventory by providing a deduction that equates to at least the same benefit that the taxpayer would have received if the taxpayer had disposed of the property.

If Section 170(e)(3) applies, the taxpayer must make a corresponding decrease in its cost of goods sold for the cost basis of the donated inventory (under Reg. § 1.170A-4A(c)(3)). This prevents the taxpayer from claiming a charitable contribution and also receiving an above-the-line deduction in cost of goods sold for the donated inventory (i.e., prevents a double deduction).

The IRS did not challenge BBB's application of Section 170(e)(3) on its original tax return.[2] The IRS also allowed BBB's application of the enhanced deduction in prior tax years under audit.  The IRS has never challenged in this case or in any prior tax years the fact that BBB donated

---

[2] The IRS conducted an audit of prior tax periods which covered the 2018 tax year, and the IRS made a minor computational adjustment on such return, but did not challenge the deductibility of any of the donated items. (Crossen Decl. ¶¶ 21-22).

qualifying inventory to qualifying charities in the amounts that BBB claimed on its returns. The IRS also has not challenged subsequent returns applying Section 170(e)(1).

The only change BBB made on the Refund Claims from prior years' practice was to remove the enhanced portion of the deduction and to only compute its deduction using the regular deduction (as the IRS had anticipated when it drafted Notice 2008-90). Mechanically, this adjustment was made by increasing the costs of goods sold for the cost basis of the donated inventory and removing any cost basis and related enhancement claimed on the contributions line of the original returns.

The IRS has alleged that BBB has not shown to the IRS's satisfaction that the inventory was purchased in the same year as the donation. As discussed below, there is nothing in the Code or Treasury Regulations that requires this, nor is there a requirement that BBB show the purchase date of every single item that was donated. Section 170(e)(1) of the Code does not even reference current inventory or impose any restrictions on cost of goods sold. Nor would such a requirement make any sense.  It is highly implausible, arbitrary and nonsensical to assume that Congress intended to allow for charitable contribution deductions for donated inventory, but only if the retailer purchased the item of inventory and donated it in the exact same calendar year.  It would make no sense to assume that Congress intended to deny the deduction for a retailer that purchased an item of inventory in December of 2025 and then donated it to charity in January of 2026, while allowing a deduction for a retailer that purchased an item of inventory in January 2025 and then donated it to charity in December of 2025.  If Congress had intended to impose such non-sensical and onerous restrictions on the application of Section 170(e)(1) to inventory purchased only in the same year as the donation, such a restriction would have to be expressly stated in the statute.

16

Further, this position would impose burdensome recordkeeping obligations, which is contrary to the legislative history. *See* Treasury Decision 7807, 47 FR 4508-01 (1982). The sole reference in the regulations to inventory acquired in a year prior to the donation is a provision that requires the taxpayer to ensure that the taxpayer makes an adjustment to cost of goods sold so that the taxpayer does not take two deductions for the same item—something that is not an issue here.

Thus, to claim relief under either Section 170(e)(1) or 170(e)(3), the taxpayer must establish only that it meets the requirements of the relevant Code subsection and that there is no double counting of the same inventory item (in accordance with Reg. 1.170A-1(c)(4)). BBB has met all of these requirements with respect to the Refund Claims.

### b.   IRS Notice 2008-90

When the IRS first issued Notice 2008-90, the IRS announced that it was "studying the computation of the deductible amount and adjustment to cost of goods sold" for "qualified contributions as defined in § 170(e)(3)(A) of the Internal Revenue Code." *See* Notice at p. 1. The IRS's stated rationale for studying this issue is the precise issue that BBB faced, that "some taxpayers making qualified contributions may, because of the income limitation of § 170(b)(2), prefer to apply the provisions of § 170(e)(1) and § 1.170A-1(c) of the Income Tax Regulations rather than the provisions of § 170(e)(3) and § 1.170A-4A(c)." *Id*. The Notice then states:

> For a particular qualified contribution of inventory property under § 170(e)(3) that otherwise satisfies the requirements of § 170 and the relevant regulations, *the Service will not challenge a taxpayer's computation of the deductible amount and the required adjustment to cost of goods sold under either (1) § 170(e)(3) and § 1.170A-4A(c), or (2) § 170(e)(1) and § 1.170A-1(c)*. (Emphasis added).

*Id*. Thus, BBB must merely demonstrate that a contribution is a "qualified contribution of inventory property under § 170(e)(3) that otherwise satisfies the requirements of § 170 and the

relevant regulations" and then may compute the tax benefit under either Section 170(e)(1) or Section 170(e)(3). There is no dispute here that the contributions meet the definition of qualified contributions, and the IRS has not challenged such treatment under Section 170(e)(3)(A) (and notwithstanding the fact that the IRS has not challenged that these are qualified contributions, BBB voluntarily provided ample documentation to demonstrate that the donations are qualified contributions. (Crossen Decl. ¶ 35).

BBB did precisely as the Notice directs – BBB applied either computational method under Section 170(e)(1) or Section 170(e)(3), and BBB's adjustments on the Refund Claims are proper. The Code and the express terms of Notice 2008-90 provide clear guidance that taxpayers are entitled to compute the deduction based on their individual circumstances.

At the hearing on the Motion to Dismiss, the IRS asserted that the Notice applies only to the "initial" computation chosen. However, as this Court noted at the hearing, the word "initial" does not appear in the Notice, and nowhere does the Notice imply that this flexible treatment is so limited. *See* Transcript of Motion to Dismiss by the IRS Before the Honorable Vincent F. Papalia, November 13, 2024 (Doc. 38) (hereinafter, "Tr.") at 14:22-25. In fact, the wording of the Notice suggests a flexible approach to choosing one computation or the other, which suggests that there is no bar to taking such position on an amended return. It is also notable that the Notice treats this as a method of computation, rather than an irrevocable election, as further discussed below.

<strong>2.    The Refund Claims Are Valid Claims For Refund</strong>

As noted above, the parties agree that BBB qualified for the enhanced method under Section 170(e)(3), as claimed on the original tax returns, and the IRS has not challenged that the

18

inventory donations represented qualified contributions, or that they were made in the tax year for which the deduction was claimed.

The Refund Claims meet all of the requirements for a valid refund claim, as this Court ruled in denying that part of the IRS's motion to dismiss <u>with prejudice</u>. The Refund Claims meet all of the requirements of Reg. §301.6402-2(b)(1) in that they contain a detailed explanation of the facts and law giving rise to the changes, and contain all information necessary to put the IRS on notice of the basis and extent of the claims.

Moreover, none of the defenses raised by the IRS preclude the relief sought in this case, as further discussed below. Accordingly, the Refund Claims should be allowed in full.

### C. <u>None of the Defenses Raised by the IRS Prevent The Relief Sought by BBB</u>

#### 1. <u>The Doctrine of Election Does Not Apply</u>

##### a. <u>There was no affirmative election</u>

The IRS asserts that the Refund Claims should be disallowed pursuant to the doctrine of election, a judicially created concept that prohibits taxpayers who have made irrevocable elections from revoking those elections on a later filed return. *See Estate of Fry v. Comm'r*, T.C. Memo 2024-8, 2024 WL 245014 (T.C. 2024). This judicial doctrine, however, has been limited to ***actual***, ***affirmative elections***, where the statutory intent was to create irrevocable elections, as opposed to different methods of computing a deduction for the same item of donated inventory, and nowhere in the statute or regulations is the Section 170(e)(1) or Section 170(e)(3) computation referred to as an irrevocable election between two different methods of accounting. *See, e.g., Bea v. Commissioner*, 761 Fed. Appx. 963 (11th Cir. 2019). In fact, the statute and the Notice expressly give taxpayers flexibility between computations. There are a multitude of methods of computing

tax under the Code and the mere computation of a taxpayer's tax or deductions from tax has never been deemed to be an irrevocable election.

Importantly, the application of the doctrine of election has never been – and cannot be – used to override the statutory language or intent, which is exactly what the IRS seeks to do in this case. Section 170(e)(1) *or* 170(e)(3). *See* Notice 2008-90. This doctrine is rarely applied – and when applied, only applies to express elections set forth in the statute. Otherwise, a taxpayer would be left to guess when filing a tax return whether its computation of its tax liability could ever be corrected, if later discovered to be incorrect, or whether the taxpayer is stuck with its erroneous filing.

For this reason, courts have limited application of the doctrine to Code sections where the election language is absolute. For instance, the election to waive a carryback under Section 172(b)(3) has implications that span across several tax years, and, therefore the election language in that statute leaves no ambiguity. That section provides:

> *Election to waive carryback.* Any taxpayer entitled to a carryback period under paragraph (1) may elect to relinquish the entire carryback period with respect to a net operating loss for any taxable year. Such election shall be made in such manner as may be prescribed by the Secretary, and shall be made by the due date (including extensions of time) for filing the taxpayer's return for the taxable year of the net operating loss for which the election is to be in effect. Such election, once made for any taxable year, shall be irrevocable for such taxable year.

Courts have expressed a willingness to apply the doctrine in these instances because the unambiguous statute itself states that the election is irrevocable. *See, e.g., Bea*, 761 Fed. Appx. 963 (11th Cir. 2019) (refusing to allow a taxpayer to revoke the Section 172(b)(3) election since the statute is unambiguous and expressly irrevocable). On the other hand, where a statute contains no reference to an election, the doctrine has been held not to apply. *See AG Processing v.*

*Commissioner,* 153 T.C. 34 (2019) (refusing to apply the doctrine of election to Section 1382(b), which provides that certain amounts paid "shall not be taken into account" in computing patronage dividends).

The fact that the judicial doctrine is strictly limited to situations where the statutory intent was to create irrevocable elections is reflected in the numerous Code sections and Treasury Regulations where the statutory or regulatory intent is clear. For example, there are express or strongly implied irrevocable elections set forth in IRC sections 168(b) (election regarding the alternative depreciation system); 168(f) (election to exclude certain property from the accelerated cost recovery system); 168(g) (election to use the alternative depreciation system); 168(h)(F)(ii) (election related to tax-exempt use property); 42 (f), (g), (i), (j) (elections under the low-income housing credit provisions); 263(i) (election to capitalize certain expenditures); 469(j) (election regarding passive activity loss rules); 141(b), (d), and (d)(B) (elections related to private activity bonds and qualified residential rental projects); 143(k)(D)(iii), 145(d), 147(b)(A) (elections concerning tax exempt bonds); 83(c) (election regarding the taxation of property transferred in connection with the performance of services); 3121(w) (election related to social security and Medicare taxes for certain government employees). The same is true of multiple Treasury Regulations such as 26 C.F.R. § 1.645-1 (election regarding trusts), 26 C.F.R. § 1.336-2 (regarding 336(e) election), 26 C.F.R. § 1.163(j)-9 (election for excepted trades or businesses), and 26 C.F.R. § 1.761-2 (election regarding unincorporated organizations). These are a few of the many examples where, when an election is intended to be irrevocable, the statute or regulation, expressly or by necessary implication, states that this is the case. In this case, not only is there no language in the

statute stating or implying that these computations constitute irrevocable elections, the IRS's own Notice expressly provides that the taxpayer may use either computation.

As the Court noted in *Fry*, 2024 WL 245014, * 28-29, the doctrine of election is an "equitable principle that generally precludes a taxpayer <u>who makes a conscious election</u> from revoking or amending that election without the consent of the Commissioner." (emphasis added). Thus, before the doctrine can apply, the taxpayer must have been conscious that an election was actually being made. In *Fry,* the court refused to apply the doctrine of election, emphasizing that the doctrine generally applies where the taxpayer seeks to change the treatment of contested items *inconsistently* with the treatment on the original return. The court also emphasized that "applications of the doctrine by [the Tax Court] are few and far between." 2024 WL 245014, *16.

There is no inconsistent treatment here, as Notice 2008-90 illustrates. The computation under Section 170(e)(1) and (e)(3) are not disparate choices, but rather a different method of computing the value of the benefit afforded to the taxpayer for the same items of donated inventory. Indeed, neither Section 170(e)(1) nor (e)(3) contain any reference to a choice, decision or election; the statute merely addresses the computations and requirements under each subsection. There is no inconsistency or detriment to the IRS in applying one method or the other (the removal of the enhanced benefit would ordinarily be to the taxpayer's detriment). BBB did not amend its returns to take advantage of an additional deduction; rather, BBB is merely claiming the minimum cost basis deduction the IRS intended to allow with respect to the recovery of the cost of inventory disposed of by the taxpayer in its business. This recovery is axiomatic, regardless of the method of disposal (i.e., sale, donation or trash).

Further, there was no conscious decision to make any election here. In order to make a conscious choice, BBB must have been aware that it was making a binding election, which, here, it was not. Election statutes generally direct the IRS to promulgate regulations that set forth specific procedures for making the election so that taxpayers are aware they are making a choice, and cannot claim ignorance after the fact. The only mention of any choice at all is in Notice 2008-90, which emphasizes the flexibility in applying either subsection. The doctrine of election has never been applied to a situation like this one, where there was no conscious, affirmative decision to make an election.

Likewise, in *AG Processing, Inc. v. Comm'r*, 153 T.C. 34 (2019) the Tax Court refused to apply the judicial doctrine of election in the context of recovery of benefits via deduction or cost of goods sold. The taxpayer had initially elected to treat certain payments as purchases in its costs of goods sold, but, after receiving a private letter ruling from the IRS, asserted that it was entitled to an increased domestic production activities deduction, and amended its tax return to remove the purchases from cost of goods sold and instead claim a refund based on the increased domestic production activities deduction. The Tax Court refused to apply the doctrine of election on these facts, holding that applying the doctrine would risk imposing double taxation on the taxpayer, a result which was not consistent with subchapter T (the relevant subchapter of the Code in that case).

Under the Tax Court's guidance in *AG Processing* and *Frye*, first, there must be an election between two or more different methods of reporting income (such as, for instance, selecting an accounting method or electing to carry back a net operating loss), second, there must be a conscious election of one method over another method in order for the doctrine to apply, and third, the

application of the doctrine must be consistent with the relevant Code provision against which it is sought to be applied. None of these three requirements exist here, especially where the statute in question does not reference any election and the Code and guidance thereunder promote a flexible approach to computing inventory donation benefits.

**b.      The cases cited by the IRS are inapplicable**

The cases raised by the IRS in support of its arguments in its Motion to Dismiss are wholly inapplicable. For instance, *Grynberg v. Commissioner*, 83 T.C. 255 (1984) relied upon heavily by the IRS, involved a different subsection of Section 170 (relating to individual donations of capital gain property), and, notably, *one that contained express election language*. The Code section at issue in *Grynberg* expressly stated that it was an election ("At the election of the taxpayer (made at such time and in such manner as the Secretary prescribes by regulations)"), and the case addressed whether the return in question met the requirements for that election to have been made under that section, *not* whether there was an election requirement in the first place under the statute. As noted in *Grynberg*, Section 170(b)(1)(D)(iii) permits taxpayers to "**elect the method they wish to use in calculating the amount of the charitable contribution deduction** to be claimed with respect to donations of capital gain property." 83 T.C. at 259-60 (emphasis added). The court further notes:

> That section, however, expressly grants respondent the authority to <u>establish by regulation the time by which and the manner in which the election is to be made</u>. The regulations promulgated under this section provide that the <u>election is to be made by 'attaching to the income tax return for the election year a statement indicating that the election under section 170(b)(1)(D)(iii) is being made.</u>'

83 T.C. at 260. (Emphasis added). None of that language exists in Section 170(e)(1) or (3).

In *Grynberg*, the court never had to reach the question as to whether there was an election required under the statute, because it is plainly there, in the Code and regulations. There was no argument to the contrary.  Further, it does not appear that a court ever has – at least under the current version of the Code – applied the judicial doctrine of election to a Code provision that does not affirmatively and definitively state that it is an "election."  Such a position would be antithetical to a taxpayer's right to understand the implications of its decisions, which has held to be paramount even in cases that upheld the doctrine. *See, e.g., C.H. Mead Coal Co. v. Comm'r*, 106 F.2d 388 (4th Cir. 1939).[3] The statute at issue in *Mead Coal* was unequivocal about the election ("A taxpayer making his first return under this title in respect of a property shall state whether he elects…, and the depletion allowance… shall be computed according to the election made"), but the court nonetheless considered the IRS's duty of fairness and the taxpayer's right to understand its obligations. The court reasoned:

> If an amendment made to correct a mistake, presented within a reasonable time, is rejected through ***a narrow and harsh construction of the law, to the detriment of the taxpayer, such rejection is arbitrary and unjust. It certainly is not the duty of the Commissioner to deprive a taxpayer of any rights justly due him***. . . . "[W]e do not think that such election should be held to be effected, ***unless based upon knowledge of this kind as indicative of a final and deliberate choice***."

106 F.2d at 391, *quoting Lucas v. Sterling Oil & Gas Co.*, 62 F.2d 951, 952 (6th Cir. 1933) (emphasis added).

---

[3] We note that this case, which interpreted a statute that clearly did provide for an election (and, importantly, one that impacted subsequent periods), has been overruled by subsequent cases on those grounds. *See J.E. Riley Inv. Co. v. Commissioner,* 311 U.S. 55 (1940) (highlighting the express election language in the statute, and noting that in the face of such strict election language, the taxpayer's recourse is to appeal to Congress to ameliorate the language). Both of these cases were decided on the basis of a version of the Code that is no longer in existence. However, the case is nonetheless instructive for its reasoning of statutory interpretation and the importance of ensuring taxpayers are aware of their obligations under the Code.

85262851;1

The existing case law addresses, therefore, <u>in the face of an express election</u>, when the judicial doctrine of election prevents subsequently changing such election. The doctrine does <u>not</u> apply where, as here, there is no affirmative election but rather fixing the method by which a donation amount was computed. The court in *Grynberg* concluded that the language in the return was sufficient to be deemed the election that was required in the Code and regulations, *not* that it was sufficient to be deemed an election generally. The IRS is attempting to stretch the holding of *Grynberg* to mean that any position taken on the return is an election, but that is not what *Grynberg* says.

*Grynberg* also highlights that Congress clearly intended to impose a different burden on individuals making capital gains donations than corporate donations of inventory property. Section 170 does contain a few specified elections: (1) the election to treat a contribution as paid in the prior year if made by a corporation on an accrual basis, (2) the 170(b)(1)(d) election to apply 170(e)(1) to individual contributions of capital gain property (to which (e)(1) otherwise does not apply); and (3) the election to treat the basis of wholesome food as equal to 25 percent of its fair market value. The regulations then set forth detailed rules for making the election with respect to individuals applying 170(e)(1) to capital gain property, presumably because (e)(1) does not otherwise apply to such property without such an election.

If Congress had intended the ordinary application of 170(e)(1)/(e)(3) to be an "election" that was irrevocable, it would have included the election in those sections, not only in (b)(1)(d). The regulations emphasize that Section 170(b)(1)(d) is an election to treat such property differently than is ordinarily permissible under the Code or regulations. Such an election is a conscious choice made by an overt act to which the doctrine of election applies, as the court held in *Grynberg*.

Applying the general rules of 170(e)(1) and (e)(3), however is <u>not</u> an election. This is even more true in the face of Notice 2008-90. As the court held in *Mead Coal*: "We agree with the contention made on behalf of the petitioner that the depletion provisions of the Revenue Acts of 1932 and 1934 are *<u>liberalizing, rather than limiting</u>*, provisions and that Congress intended to allow depletion deductions by one of the two methods, and intended to give taxpayers a right to elect whichever method they preferred." 106 F.2d at 391 (emphasis added).

Most of the cases that apply the judicial doctrine of election address an election that has cascading impact beyond the tax year in issue. For instance, if a taxpayer elects an accounting method or a method for depreciating assets, that decision will impact future years, and to allow a taxpayer to retroactively go back and change a prior year accounting method change or similar election could have a detrimental impact on the IRS, who would have to reopen several years of returns. In *Pacific National Co. v. Welch,* 304 U.S. 191, 194 (1938), the Supreme Court emphasized that the "change from one method to the other, as petitioner seeks, would require re-computation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws.". While courts have subsequently relied upon the holding of *Pacific National* to analyze when the judicial doctrine of election should apply, courts have also used it to distinguish from circumstances where it should not. *See, e.g., Baca v. Comm'r*, T.C. Memo 2019-78, 2019 WL 2617249 (distinguishing the express election considered in *Pacific National* from a situation where the regulations were silent as to detailed requirements of the election)[4].

---

[4] *Baca,* like many cases in this area, addressed the timing requirement for an election, not whether the statute itself required an election. Nonetheless, this line of cases is instructive. *See also Reaver v. Comm'r*, 42 T.C. 72 (1964)*; Roy H. Park Broadcasting Inc., v. Comm'r*, 78 T.C. 1093 (1982).

To the contrary, here, the computation under Section 170(e)(1) or (e)(3) is an annual computation by the taxpayer. And, of course, BBB did adjust its computation in subsequent years. The judicial doctrine of election is wholly inapplicable to the Refund Claims, and does not bar the relief sought by Plaintiff.

Thus, Plaintiff is entitled to summary judgment as a matter of law.

## 2.    The Regulations Do Not Require Tracing of the Donation to the Purchase Date

The IRS has also claimed that there is an additional requirement under Section 170(e)(1) – one that is not actually contained in the statute – that requires BBB to prove that it acquired each item of property in the same year as BBB disposed of it.  The IRS claims that this alleged requirement does not exist when a taxpayer uses the enhanced deduction computation.

The IRS's position is based on its misreading of Reg. §1.170A-1(c)(4).  This is evident from the IRS's erroneous statement in the hearing on its Motion to Dismiss:

> MS. BRUCE:  Yes, Your Honor, I believe for the original return, the date of when the inventory was acquired did not matter, because they were using what's called the enhanced method under 170(e)(3). The requirement that the inventory be purchased within that year doesn't apply to that method of computation. It's specific to the other method, the alternative method that they're trying to change to on the amended return.

(Tr. 7:6-13).

First, this is not an "alternative method;" it is one of two acceptable computations set forth in Section 170(e), and importantly, there is no requirement in Section 170(e)(1) that the inventory be purchased within the same year for either method.[5]  Nor does the regulation impose such a

---

[5] Despite the IRS's blatant misreading of the regulation, BBB nonetheless produced contemporaneous support regarding its extensive annual inventory turnover and inventory accounting practices, such that even if the IRS was correctly interpreting the regulation, this defense would not be grounds for disallowance of the entire refund claim.

requirement. Reg §1.170A-1 is focused on properly accounting for inventory costs, not imposing some onerous tracing requirement to demonstrate the purchase date of a specific item of inventory (which is particularly onerous when the average item cost is under $50 and the total amount donated (cost basis) is over $105 million.

Reg. §1.170A-1(c)(4) provides, in relevant part:

> Any such costs and expenses which are treated as part of cost of goods sold for the year of contribution, and any such costs and expenses which are properly deducted under section 162 or other section of the Code, are not to be treated under any section of the Code as resulting in any basis for the contributed property. Thus, for example, ***the contributed property has no basis for purposes of determining under section 170(e)(1)(A) and paragraph (a) of §1.170A-4 the amount of gain which would have been recognized if such property had been sold by the donor at its fair market value at the time of its contribution.***

26 C.F.R. § 1.170A-1(c)(4) (emphasis added). This means, in practice, that costs and expenses incurred in the year of contribution may be treated as part of cost of goods sold for the year of contribution, but those costs may not then be treated as creating basis for the contributed property (which would thus provide another level of benefit).

This makes sense because it is intended to confirm that a taxpayer cannot receive a double benefit. The regulation simply requires that if inventory purchased in a prior year is donated in the current year, the items must be removed from inventory and not be treated as part of cost of goods sold in the current year (to avoid a double benefit), while inventory purchased in the current year can remain in cost of goods sold for the current year.

The regulation is directed at advising a taxpayer when a donated item of inventory is deductible and when it should be treated as reducing cost of goods sold, and ensuring that basis is properly adjusted so that there is no undue benefit. The heading of the subsection in the regulation, "Value of a Contribution in Property," confirms that the focus of this section is on properly

computing the basis of donated inventory. Thus, the regulation section is intended not to disallow a benefit or impose an onerous tracing requirement, but merely to ensure no double benefit and that only the correct amount of benefit is received.

The examples in the regulation are instructive and clear on this issue:

> Example 1.
> In 1970, A, an individual using the calendar year as the taxable year and the accrual method of accounting, contributed to a church property from inventory having a fair market value of $600. The closing inventory at the end of 1969 properly included $400 of costs attributable to the acquisition of such property, and in 1969 A properly deducted under section 162 $50 of administrative and other expenses attributable to such property. Under section 170(e)(1)(A) and paragraph (a) of §1.170A-4, the amount of the charitable contribution allowed for 1970 is $400 ($600−[$600−$400]). Pursuant to this subparagraph, the cost of goods sold to be used in determining gross income for 1970 may not include the $400 which was included in opening inventory for that year.

> Example 2.
> The facts are the same as in *Example 1* except that the contributed property was acquired in 1970 at a cost of $400. The $400 cost of the property is included in determining the cost of goods sold for 1970, and $50 is allowed as a deduction for that year under section 162. A is not allowed any deduction under section 170 for the contributed property, since under section 170(e)(1)(A) and paragraph (a) of §1.170A-4 the amount of the charitable contribution is reduced to zero ($600−[$600−$0]).

26 C.F.R. § 1.170A-1(c).

Read together with IRS Notice 2008-90, these examples confirm that the correct interpretation of Reg. §1.170A-1(c)(4) is to that no double benefit occurs. There is no risk of double benefit in BBB's case with respect to its amended claims. During its audit of the Refund Claims, BBB produced to the IRS the workpapers and financial records supporting the Original and Amended Tax Returns, which demonstrate unequivocally that any donated items were removed from cost of goods sold in the Original Tax Returns. (Crossen Decl. ¶ 35). The IRS has not challenged or raised any issues regarding the documentation or amounts at issue.

Finally, the legislative history of Reg. § 1.170A-4A (discussing the enhanced deduction

under Section 170(e)(3)) condones a flexible, aggregate approach to donated inventory, which

provides further evidence that the Debtor's position is correct.  Treasury Decision 7807, 47 FR

4508-01 at 4509 provides, in relevant part:

> The proposed regulations provided, in § 1.170A-4A(b)(4), that adequate books and records must be kept to show the identity of the donor and transferring organization, the use of the property, and the nature of any disposition of the property. Several comments stated that this requirement necessitated burdensome recordkeeping. ***Since these recordkeeping requirements should not be unnecessarily burdensome, the rule in the final regulations has been modified to reduce required recordkeeping. The final rules make it clear that the books and records need not reflect a tracing of the receipt and disposition of specific items of donated property. It is sufficient if the books and records disclose compliance with the requirements of section 170(e)(3) by reference to aggregate quantities of donated property.*** The books and records are adequate if they reflect the total amount of property received and distributed (or used), and outline the procedure used for determining that the ultimate recipient of the property is an ill or needy individual, or infant.  However, the books and records need not reflect the names of the ultimate individual recipients or the property distributed to (or used by) each one.

(emphasis added). The regulations emphasize ensuring that contributions were made to qualified

recipients rather than imposing restrictive and burdensome requirements to trace items of

inventory, nor has the IRS raised any issues about the documentation that the contributions were

made to qualified recipients.

Beyond not being authorized by the Code or regulations, requiring a tracing of inventory

purchases would apply form over substance, and would impose an impossible and impractical

standard, clearly not what was intended in this situation. Taxpayers are only required to maintain

descriptions of donated property that are "reasonably sufficient under the circumstances." Reg.

§1.170A-13. Further, Reg. §1.170A-16 permits filing a single Form 8283 aggregating "similar

items of property." Finally, Reg. §1.170A-4A specifically states that taxpayers need not trace

inventory and may take an aggregate approach. Nowhere do the regulations require tracing of items of inventory on an item by item basis.

Accordingly, the Refunds Claims, which this Court ruled were valid claims, were sufficient to meet the requirements of Section 170(e) and the regulations thereunder. As neither of the defenses raised by the IRS preclude the relief sought, Debtor is entitled to relief as a matter of law.

### Conclusion

For all of the reasons set forth above, Plaintiff respectfully requests that the Court (i) enter judgment requiring the Defendant to immediately turn over and deliver to Debtors the Refunds plus any accrued interest thereon, and/or any other amount determined to be due to Debtors by this Court; (ii) enter judgment against Defendant for unjust enrichment and award Plaintiff restitution damages on account of Defendant's unjust enrichment; (iii) find and declare that the judicial doctrine of election does not apply to the Refund Claims; (iv) award Plaintiff prejudgment interest at the applicable statutory or otherwise legally applicable interest rate; (v) award Plaintiff costs and expenses of this suit; and (vi) such other relief as the Court deems just.

Dated: February 3, 2026

Respectfully submitted,

**AKERMAN LLP**

By: */s/ Steven R. Wirth*
    Steven R. Wirth, Esq.
    Email: steven.wirth@akerman.com
    Raye C. Elliott, Esq. (admitted *pro hac vice*)
    Email:  raye.elliott@akerman.com
    401 East Jackson Street, Suite 1700
    Tampa, Florida 33602
    Telephone: (813) 223-7333
    Facsimile: (813) 223-2837

85262851;1

and

Peter O. Larsen, Esq. (admitted *pro hac vice*)
Email: peter.larsen@akerman.com
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
Telephone: (904) 798-3700
Facsimile:  (904) 798-3730

and

Stefi George (admitted *pro hac vice*)
Email: stefi.george@akerman.com
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Telephone: (212) 880-3800
Facsimile:  (212) 880-8965


*Counsel for the Plan Administrator*

85262851;1