| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>Steven Wirth<br>Peter O. Larsen (admitted *pro hac vice*)<br>Raye Elliott (admitted *pro hac vice*)<br>Stefi George (admitted *pro hac vice*)<br>401 East Jackson Street, Suite 1700<br>Tampa, FL 33602<br>Telephone: (813) 223-7333<br>Facsimile:  (813) 223-2837<br>Email:  steven.wirth@akerman.com<br>    peter.larsen@akerman.com<br>    raye.elliott@akerman.com<br>    stefi.george@akerman.com<br><br>*Counsel to the Plan Administrator* | |
| In re:<br><br>20230930-DK-BUTTERFLY-1, INC. f/k/a Bed Bath & Beyond, Inc., *et.al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 23-13359 (VFP)<br><br>(Jointly Administered) |
| MICHAEL GOLDBERG, as Plan Administrator for 20230930-DK-BUTTERFLY-1, INC. f/k/a Bed Bath & Beyond, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>INTERNAL REVENUE SERVICE, an agency of the United States of America,<br><br>    Defendant. | Adversary Proceeding No. 24-01533 (VFP) |

### PLAINTIFF'S MEMORANDUM OF LAW IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

86133982;3

Plaintiff, Michael Goldberg as Plan Administrator (the "Plan Administrator" or "Plaintiff") for 20230930-DK-Butterfly, Inc. f/k/a Bed Bath & Beyond, Inc. and affiliates ("Debtor or Debtors"), by and through undersigned counsel, submits this Memorandum of Law in Reply to the Opposition[1] (Adv. Doc. 50) (the "Opposition") filed by Defendant Internal Revenue Service ("IRS" or "Defendant") to Plaintiff's Motion for Summary Judgment (the "Motion").

## PRELIMINARY STATEMENT

Defendant asserted only two bases for disallowance of the Refund Claims: (1) the doctrine of election; and (2) Defendant's reading of an additional requirement into Reg. §1.170A-1(c)(4) (i.e., that Plaintiff must establish that all of its donated inventory was purchased in the current year). Both of Defendant's reasons for disallowing the Refund Claims are legal issues, As set forth in the Motion, neither of these bases constitute grounds for disallowing the Refund Claims, and, therefore, Plaintiff is entitled to summary judgment.

Defendant, on the eve of the deadline for filing the Response in Opposition to the Motion (a deadline which Plaintiff agreed to extend for 30 days as a courtesy to Defendant), filed discovery requests, in an effort to create a basis for adjourning the hearing and delaying the relief sought by Plaintiff. These discovery requests have nothing to do with the two legal issues raised in the Motion and are not relevant, necessary or appropriate at this time. In order for Defendant to claim that discovery must precede a ruling on the Motion, Defendant must make a showing that such discovery is necessary to oppose the claims made in the Motion. Defendant cannot do so here, as

---

[1] Defendant submits a joint brief that purports to represent both its Opposition to Plaintiff's Motion for Summary Judgment as well as its Cross-Motion for Summary Judgment. Plaintiff submits that this joint filing does not comply with this Court's procedures. For purposes of this Reply, Plaintiff responds only to the contents of the Defendant's Opposition to the extent that they respond to the Motion, and reserves the right to file a supplemental response in opposition to the Cross-Motion for Summary Judgment.

86133982;3

none of the discovery is relevant to the application of the doctrine of election or the interpretation of Reg. §1.170A-1(c)(4) (an issue not even addressed by Defendant in its Opposition). Discovery that is not relevant to the Motion cannot serve as a basis for delaying a ruling on the Motion. *See In re Avandia Mktg., Sales & Prods. Liab. Litig.*, 945 F.3d 749 (3d Cir. 2019) ("If discovery is incomplete, district court is rarely justified in granting summary judgment, ***unless the discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law***." (emphasis added)).

Further, the discovery requests appear designed to conduct a fishing expedition on a closed tax year to search for potential issues to offset any refund owed to Plaintiff. This is a wholly improper use of discovery and the resources of this court and cannot be permitted to stand. Moreover, at the hearing on Defendant's Motion to Dismiss, the IRS admitted that if Plaintiff had taken this same position on its originally filed tax returns, the IRS would have allowed the charitable deductions (in costs of goods sold) that Plaintiff claimed on the amended returns. Why, then, does Defendant believe that full scale discovery is necessary on the items contained in Plaintiff's tax return?

Plaintiff submits that no discovery is necessary for this Court to rule on the Motion. It is clear from the statute, the regulations and Notice 2008-90 that Section 170(e) does not provide for an election. As Notice 2008-90 states, the intent of Section 170(e) was to provide maximum flexibility to taxpayers donating inventory (while ensuring limitations were in place to curb abuse), and allow deductibility to the fullest extent possible, to incentivize donations. Nothing in the Notice (or the Code or regulations) restricts such flexibility to an originally filed return. And no court has ever applied the doctrine to limit deductions in such a context, where the manifested

86133982;3

intent of Congress and the IRS is to incentivize donations of inventory (as opposed to trashing the inventory) and where the Code provides for no express election. The case law, generally, applies the doctrine to curb abuse or manipulation by the taxpayer, an issue wholly not present here. To the contrary, Plaintiff is merely attempting to recover the cost of inventory that it donated to the poor, sick and needy during the taxable years at issue.

Further, Defendant does not in its Opposition dispute Plaintiff's interpretation of Reg. §1.170A-1(c)(4), so Plaintiff submits that summary judgment is appropriate. There remains no basis to deny these legitimate charitable contribution deductions (the same contributions which were deducted, and a portion of which was limited and carried forward, on the original return and remain unchallenged).

For the reasons set forth herein, none of the defenses raised by Defendant bar such relief, as (1) the Doctrine of Election does not apply; and (2) the IRS's position on Reg. §1.170A-1(c)(4) is based on a misreading of that regulation, a misreading that has no support in the Code, regulations or legislative history.  Accordingly, this Court should grant this Motion in full and order the relief requested by Plaintiff in its Amended Complaint.

## ARGUMENT

### A.    The Doctrine of Election Does Not Apply

In its Opposition, Defendant twists the language in the statute, Notice 2008-90, and the relevant case law, all in an effort to bring Section 170(e) within the purview of the election doctrine. These attempts fail for the reasons set forth herein.

4

### 1. The Statute Does Not Contain an Election

Defendant asserts (on page 11), that the election doctrine applies, "[W]here the statute plainly provides that choice of methods, and the taxpayer necessarily chooses one method over the other…".  Setting aside the fact that a choice of methods does not necessarily invoke the election doctrine, Defendant fails to mention that the statute in question *does not plainly provide any such choice*.

Section 170(e)(1) states, in its entirety:

General Rule – The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of—

(A)   the amount of gain which would not have been long-term capital gain (determined without regard to section 1221(b)(3)) if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), and

(B)   in the case of a charitable contribution—

   (i)   of tangible personal property—

      (I)   if the use by the donee is unrelated to the purpose or function constituting the basis for its exemption under section 501 (or, in the case of a governmental unit, to any purpose or function described in subsection (c)), or

      (II)   which is applicable property (as defined in paragraph (7)(C), but without regard to clause (ii) thereof) which is sold, exchanged, or otherwise disposed of by the donee before the last day of the taxable year in which the contribution was made and with respect to which the donee has not made a certification in accordance with paragraph (7)(D),

   (ii)   to or for the use of a private foundation (as defined in section 509(a)), other than a private foundation described in subsection (b)(1)(F),

   (iii)   of any patent, copyright (other than a copyright described in section 1221(a)(3) or 1231(b)(1)(C)), trademark, trade name, trade secret, know-how, software (other than software described in section

5

197(e)(3)(A)(i)), or similar property, or applications or registrations of such property, or

(iv)   of any taxidermy property which is contributed by the person who prepared, stuffed, or mounted the property or by any person who paid or incurred the cost of such preparation, stuffing, or mounting, the amount of gain which would have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution).

For purposes of applying this paragraph (other than in the case of gain to which section 617(d)(1), 1245(a), 1250(a), 1252(a), or 1254(a) applies), property which is property used in the trade or business (as defined in section 1231(b)) shall be treated as a capital asset. For purposes of applying this paragraph in the case of a charitable contribution of stock in an S corporation, rules similar to the rules of section 751 shall apply in determining whether gain on such stock would have been long-term capital gain if such stock were sold by the taxpayer.

Section 170(e)(3) states, in its entirety (emphasis added):

(A)   Qualified Contributions – For purposes of this paragraph, a qualified contribution shall mean a charitable contribution of property described in paragraph (1) or (2) of section 1221(a), by a corporation (other than a corporation which is an S corporation) to an organization which is described in section 501(c)(3) and is exempt under section 501(a) (other than a private foundation, as defined in section 509(a), which is not an operating foundation, as defined in section 4942(j)(3)), but only if—

(i)    the use of the property by the donee is related to the purpose or function constituting the basis for its exemption under section 501 and the property is to be used by the donee solely for the care of the ill, the needy, or infants;

(ii)   the property is not transferred by the donee in exchange for money, other property, or services;

(iii)  the taxpayer receives from the donee a written statement representing that its use and disposition of the property will be in accordance with the provisions of clauses (i) and (ii); and

(iv)   in the case where the property is subject to regulation under the Federal Food, Drug, and Cosmetic Act, as amended, such property must fully satisfy the applicable requirements of such Act and regulations promulgated thereunder on the date of transfer and for one hundred and eighty days prior thereto.

6

(B)     Amount Of Reduction – The reduction under paragraph (1)(A) for any qualified contribution (as defined in subparagraph (A)) shall be no greater than the sum of—

(i)     one-half of the amount computed under paragraph (1)(A) (computed without regard to this paragraph), and

(ii)    the amount (if any) by which the charitable contribution deduction under this section for any qualified contribution (computed by taking into account the amount determined in clause (i), but without regard to this clause) exceeds twice the basis of such property.

(C)     Special Rule For Contributions Of Food Inventory

(i)     General Rule – In the case of a charitable contribution of food from any trade or business of the taxpayer, this paragraph shall be applied—

(I)     without regard to whether the contribution is made by a C corporation, and

(II)    only to food that is apparently wholesome food.

(ii)    Limitation – The aggregate amount of such contributions for any taxable year which may be taken into account under this section shall not exceed—

(I)     in the case of any taxpayer other than a C corporation, 15 percent of the taxpayer's aggregate net income for such taxable year from all trades or businesses from which such contributions were made for such year, computed without regard to this section, and

(II)    in the case of a C corporation, 15 percent of taxable income (as defined in subsection (b)(2)(D)).

(iii)   Rules Related To Limitation

(I)     Carryover - If such aggregate amount exceeds the limitation imposed under clause (ii), such excess shall be treated (in a manner consistent with the rules of subsection (d)) as a charitable contribution described in clause (i) in each of the 5 succeeding taxable years in order of time.

86133982;3

(II) Coordination With Overall Corporate Limitation - In the case of any charitable contribution which is allowable after the application of clause (ii)(II), subsection (b)(2)(A) shall not apply to such contribution, but the limitation imposed by such subsection shall be reduced (but not below zero) by the aggregate amount of such contributions. For purposes of subsection (b)(2)(B), such contributions shall be treated as allowable under subsection (b)(2)(A).

(iv) Determination Of Basis For Certain Taxpayers — If a taxpayer

(I) does not account for inventories under section 471, and

(II) is not required to capitalize indirect costs under section 263A,

**the taxpayer may elect, solely for purposes of subparagraph (B), to treat the basis of any apparently wholesome food as being equal to 25 percent of the fair market value of such food.**

(v) Determination Of Fair Market Value – In the case of any such contribution of apparently wholesome food which cannot or will not be sold solely by reason of internal standards of the taxpayer, lack of market, or similar circumstances, or by reason of being produced by the taxpayer exclusively for the purposes of transferring the food to an organization described in subparagraph (A), the fair market value of such contribution shall be determined

(I) without regard to such internal standards, such lack of market, such circumstances, or such exclusive purpose, and

(II) by taking into account the price at which the same or substantially the same food items (as to both type and quality) are sold by the taxpayer at the time of the contribution (or, if not so sold at such time, in the recent past).

(vi) Apparently Wholesome Food – For purposes of this subparagraph, the term "apparently wholesome food" has the meaning given to such term by section 22(b)(2) of the Bill Emerson Good Samaritan Food Donation Act (42 U.S.C. 1791(b)(2)), as in effect on the date of the enactment of this subparagraph.

86133982;3

(D)   This paragraph shall not apply to so much of the amount of the gain described in paragraph (1)(A) which would be long-term capital gain but for the application of sections 617, 1245, 1250, or 1252.

A few things are readily apparent from reading the express language of Sections 170(e)(1) and (3). First, contrary to Defendant's assertion, these sections do not "plainly" provide any such choice or election between two methods. Indeed, there is not even a choice contemplated in the section itself. Rather, the subsections provide computational mechanisms and limitations with respect to certain charitable contributions. Further, the only use of the word "elect" in Section 170(e) is with respect to an express election to treat the basis of apparently wholesome food as being equal to 25% of the fair market value, an election that has nothing to do with the contributions at issue herein.

If Congress intended Section 170(e) to be treated as an election, it would have expressly provided as such, as it has in numerous places in the Code (including within Section 170(e) itself, with respect to apparently wholesome food). Given the binding nature of elections and the application of the doctrine of election to elections, Congress would have made such language expressly clear if it was intended to apply.

Finally, a comparison between Section 170(e)(3) and the version of Section 170(b)(1)(D)(iii) at issue in *Grynberg v. Commissioner*, 83 T.C. 255 (1984) demonstrates how far afield this section is from the type of language to which courts have applied the election doctrine. That section provided:

> (iii) **At the election of the taxpayer (made at such time and in such manner as the Secretary or his delegate prescribes by regulations),** subsection (e)(1) shall apply to all contributions of capital gain property (to which subsection (e)(1)(B) does not otherwise apply) made by the taxpayer during the taxable year. If such an election is made, clauses (i) and (ii) shall not apply to contributions of capital gain property made during the taxable year, and, in applying subsection (d) (1) for such

9

86133982;3

taxable year with respect to contributions of capital gain property made in any prior contribution year for which an election was not made under this clause, such contributions shall be reduced as if subsection (e)(1) had applied to such contributions in the year in which made. (Emphasis added).

This provision was further supported by detailed regulations (*Reg. 1.170A-8(d)(2)),* which provide for the manner of making the election. The elections set forth in Section 170 of the Code are clear, and are accompanied by regulations that explain how to make such an election. Section 170(e) is not such a provision, and the plain language of the provision demonstrates that the doctrine of election should not apply.

### 2. Notice 2008-90 Wholly Contradicts Defendant's Argument

Defendant's attempt to contort Notice 2008-90 into providing for an election also fails, because the language of the Notice unambiguously supports Plaintiff's argument. Likewise, Defendant's claim that Notice 2008-90 should have put Plaintiff on notice that it was making a binding election is impossible to square with the language of the Notice itself.

Defendant also asserts that CCA 201012061 somehow undercuts Plaintiff's reading of Notice 2008-90, but again, the plain language of the Notice and the CCA (both of which were drafted by the IRS) prove to the contrary. In fact, CCA 201012061 merely reasserts the general requirements for Section 170(e)(3) deductibility – ***requirements which the IRS has not challenged since the original returns were filed***.[2] The CCA further states that "[t]he Notice allows a taxpayer who otherwise qualifies for a charitable contribution "enhanced" deduction under

---

[2] Defendant further claims that Plaintiff did not demonstrate it meets these requirements, which appears to be a "hail mary" attempt to conduct an audit of Plaintiff's original tax returns. Defendant had ample opportunity to challenge such returns during the statute of limitations assessment period, and never challenged the correctness of the contributions. Defendant's attempt to open a full scale audit of Plaintiff's in the middle of this proceeding is a thinly veiled attempt to go on a fishing expedition to avoid paying out the refunds.

86133982;3

section 170(e)(3) to use the "limited-to-basis" deduction under 170(e)(1)(A) instead. It is difficult to see how this language "belies Plaintiff's argument", as Defendant claims.

Again, the plain language of Notice 2008-90 states that the IRS is "studying the computation of the deductible amount and adjustment to cost of goods sold for charitable contributions of inventory property" and the IRS "is aware that some taxpayers making qualified contributions may, because of the income limitation of § 170(b)(2), prefer to apply the provisions of § 170(e)(1)…rather than the provisions of § 170(e)(3)…". Finally, the Notice states "the Service will not challenge a taxpayer's computation of the deductible amount and the required adjustment to cost of goods sold under (1) § 170(e)(3) and § 1.170A-4A(c), or (2) § 170(e)(1) and § 1.170A-1(c). Contrary to Defendant's misreading, nowhere in Notice 2008-90 "[make] clear that taxpayers have an elective choice" such that the election doctrine should apply, particularly in the absence of election language in the statute and regulations.

### 3.    The Legislative History Also Contradicts Defendant's Argument

Moreover, to fully understand the context for Notice 2008-90, it is important to understand the legislative history for Section 170(e). The stated purpose of Section 170(e) was to incentivize donations, and the legislative history makes clear the limitations in place were to prevent a windfall to the taxpayer resulting from either donation of highly appreciated inventory (and avoiding a gain) or double counting of inventory items. *See P.L. 91-172* (enacting Section 170(e) and *P.L. 94-455* (adding Section 170(e)(3) to ameliorate the disincentives created in the 1969 version).[3] The stated intent in 1969 was to prevent a taxpayer (specifically, a high net-worth individual) from

---

[3] Notably, in 1969, when Section 170(e) was proposed, the House version proposed inclusion of an election between cost of goods sold and fair market value, which the Senate rejected and did not include in the final enacted version of Section 170(e). *P.L. 91-172*. Other than with respect to wholesome foods, Section 170(e) has never contained any reference to an election or choice.

11

eliminating the appreciated gain while also deducting the contribution, thereby obtaining a double benefit. This concern was highlighted in the legislative history for the Tax Reform Act of 1969. *P.L. 91-172*.

By 1976, Congress was concerned that 170(e) was disincentivizing contributions and encouraging taxpayers to throw items in the trash rather than donating them. Thus, the Tax Reform Act of 1976 enacted 170(e)(3), creating the enhanced deduction. There is no mention in the legislative history for either the Tax Reform Act of 1969 or 1976 of any election or binding choice – rather, this was intended as an ameliorative provision to reduce the negative impact of Section 170(e)(1) on charitable giving. The legislative history confirms:

> The present rules were enacted in 1969 to prevent the abuse which gave rise to an after-tax profit when appreciated ordinary income property was contributed to charities. Medical missionary and relief groups assert, however, that the 1969 changes have greatly decreased contributions of drugs and medical supplies, even where manufacturers have surplus stocks. By simply discarding surpluses, the manufacturers may obtain a deduction for their inventory cost. In contrast, a charitable contribution often requires additional expenditures for repackaging, transportation, etc. Although such additional costs would be tax deductible, the manufacturer would still be out of pocket for part of the expenses. The tax law, thus, tends to disfavor charitable contributions.

S. Rept. No. 94-938 (Part 2), 94th Cong. 2d Sess. (July 20, 1976).

Thus, Section 170(e)(1) and Section 170(e)(3) were never intended to be an elective choice; rather Section 170(e)(1) was designed to curb abuse by high net-worth individuals, and Section 170(e)(3) was enacted to remedy the inadvertent disincentives caused by the harsh implications of Section 170(e)(1). The sections should not be read as a choice between two alternatives, but rather a limitation on deductibility and a corresponding exception to the limitation, creating an incentive to combat the negative effects of such limitation.

12

In this context, it is clear that Notice 2008-90 furthers the stated goals of enactment of Section 170(e)(3), by acknowledging that 170(e)(3) does not always correct the disincentives created by Section 170(e)(1), and that the taxpayer may in fact be better off applying the general rule.

Accordingly, the Notice and the legislative history make clear that there was never intended to be an election, and the doctrine is wholly inapplicable here.

**4.      None of the Cases Cited By Defendant Support Application of the Election Doctrine to Plaintiff's Claims**

Finally, Defendant's discussion of cases applying the election doctrine mischaracterizes the holdings of such cases, or takes quotes out of context in an effort to craft an argument. For instance, Defendant claims that *Pacific National Co. v. Welch*, 304 U.S. 191 (1938) stands for the proposition that "when a taxpayer chooses between two methods of computing something on their tax return, even when the statute makes no reference to an election, the Election Doctrine applies." *See* Opposition at p. 9. Respectfully, Defendant reads words into the Supreme Court's decision that simply do not exist. The Supreme Court did not discuss election language, as it was not determining whether an election exists. Rather, the Supreme Court was applying the version of the Code as it existed in 1938, which generally limited the filing of amended returns to the original due date of the return, except in specified circumstances, because unlike today, there was no statutory provision for amended returns. Thus, the Supreme Court held: "It would operate to enlarge the statutory period for filing returns, section 53(a), 26 U.S.C.A. s. 53(a), and note, to include the period allowed for recovering overpayments, section 322(b), 26 U.S.C.A s. 322 note. There is nothing to suggest that Congress intended to permit a taxpayer, **after expiration of the time within which return is to be made**, to have his tax liability computed and settled according

13

to the other method." *Pacific Nat.*, 304 U.S. at 194. (Emphasis added). This case was at its core a question of amending a return outside the statutory period, and does not stand for the proposition that "even when the statute makes no reference to an election, the Election Doctrine applies."

Further, Defendant factually misrepresents the tax returns at issue in an attempt to fit this case into the existing precedent. As Plaintiff has demonstrated repeatedly to the IRS, this issue ***does not have any impact on subsequent periods***. A routine carryover is not at all akin to the recomputation of income required for a retroactive formal change in accounting method, or similar type of election. Plaintiff in fact applied Section 170(e)(3) on some of its tax returns and Section 170(e)(1) on others, because each year stands on its own, and Defendant's claim that this "is the exact type of elective choice that merits application of the doctrine, because to '[c]hange from one method to the other … would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws'" (Opposition at p. 8) is patently false. This issue is limited to the tax returns for the periods at issue, and is not remotely similar to the type of election that requires "recomputation and readjustment of tax liability for subsequent years" (such as, for example, a Section 481(a) adjustment changing the method of accounting).

Interestingly, Defendant adds: "Notably, simultaneous to this suit, Plaintiff is litigating a *second* multi-million-dollar refund suit on behalf of Debtor involving more than $5 million dollars for the same tax years at issue here. *See Goldberg v. Internal Revenue Service*, Adv. Proc. No 26-01030-VFP." *See* Opposition at p. 8, fn. 3. While it is unclear what Defendant is implying with this reference, Plaintiff notes that Plaintiff was forced to file this suit because Defendant is erroneously refusing to pay refunds previously approved by the Congressional Joint Committee

14

86133982;3

on Taxation in May 2025 without any explanation. It appears, from this reference, that Defendant is implying it is withholding these refunds as potential offset for any "recomputation or readjustment of tax liability," which, in addition to being in violation of the taxpayer's rights and IRS procedures, is also based on its foundational misunderstanding of the basis of this claim.

Defendant also misrepresents the holdings of *Goldstone v. Commissioner,* 65 T.C. 113 (1975), *Bayley v. Commissioner,* 35 T.C. 288 (1960), and *Est. of Curtis v. Commissioner,* 36 B.T.A. 899 (1937).[4] All three of these cases were decided under prior versions of the Code, which did not freely permit amended returns as the Code does today. *See Miskovsky v. United States*, 414 F.2d. 954, 955 (3d Cir. 1969) ("There is no statutory provision for amended returns of either income or gift taxes…The treatment of amended returns is 'a matter of internal administration in the Bureau of Internal Revenue, solely within the discretion of the Commissioner.").  Thus, these cases interpret provisions that existed at a time when a taxpayer had limited ability to amend a return in the first place.[5] As such, none stand for the position claimed by Defendant – that the election doctrine does not require an election. Further, the clear intent of the election doctrine is to protect the IRS from having to adjust subsequent periods retroactively based on an election on a prior year return. This was the precise issue in *Goldstone*, where the taxpayer was attempting to remove a credit years later solely to avoid recapture of that gain on a subsequent return. The

---

[4] Defendant also quotes a treatise that says an election once made is binding, but it is not clear how this is relevant to Plaintiff's argument, since Plaintiff has not alleged that an express election is not subject to the election doctrine. In fact, this treatise merely reiterates the general rule that the election doctrine requires a conscious, deliberate choice between alternatives and an overt act. Plaintiff submits that no such deliberate choice or overt act occurred here.

[5] Contrary to Defendant's assertion, Plaintiff does not claim that the doctrine of election does not exist today; rather, Plaintiff submits that its application must be determined in the context of the current version of the Code, which freely permits the filing of amended returns, and the cases decided under prior versions of the Code are of limited utility in making this determination.

86133982;3

taxpayer was attempting to game the system, as the Tax Court noted, "To sanction the course of action petitioners seek to pursue would enable petitioners to contravene the clear statutory language and would constitute a usurpation of the legislative function by this Court." *Goldstone*, 65 T.C. at 117. This is patently distinguishable from the case at hand – where the refund claim is a standalone issue for the tax year for which it is filed.[6] Further, the Refund Claim does not create a subsequent or otherwise disallowed benefit, rather it simply allows the deduction of the cost of donated inventory, which is consistent with treatment of any disposed inventory, whether sold, damaged, lost or donated. Thus, *Goldstone* is not instructive here.

Accordingly, none of the cases cited by Defendant support treating the provision in question, which does not reflect an election – or even an overt choice – as being subject to the doctrine of election. Barring these refunds on the basis of the doctrine of election would significantly impair the intent behind these provisions, as evidenced by the legislative history and Notice 2008-90, and would expand the scope of the election doctrine far beyond its application in cases to date.

B.      **There is No Current Inventory Requirement in Section 170(e)(1) or the Regulations**

Defendant's Opposition does not provide any argument to dispute Plaintiff's Motion with respect to the proper interpretation of Reg. §1.170A-1(c)(4), and Plaintiff submits that under a plain reading of the regulation, Plaintiff's charitable contribution deductions are not limited to inventory acquired in the current year.

---

[6] Further, the court in *Goldstone* did acknowledge the validity of amended returns, but noted, as the Supreme Court did in *Pacific National*, that the Code at the time limited such returns to those filed before the due date for the original return except in specified circumstances.

This is further bolstered by the legislative history for Section 170(e), as discussed further above. In fact, Reg. §1.170A-1(c)(4) was promulgated when the Tax Reform Act of 1969 first added Section 170(e) (and Section 170(e)(3) did not exist), and has remained unchanged since. As such, there is no support for Defendant's position that the regulation restricts Section 170(e)(1) deductions to contributions of inventory purchased in the current year, but this alleged restriction does not apply to Section 170(e)(3) contributions. The legislative history confirms that Congress was concerned about bargain sales and individuals avoiding tax on appreciated property.[7] *P.L. 91-172* ("Significant tax savings can be effected by selling appreciated property to a charity for an amount equal to its cost (tax basis). This permits the tax-free recovery of cost, and at the same time a deduction for the appreciation in value without the payment of tax on the appreciation. To correct this abuse, special rules for the allocation of basis on these "bargain sale" transactions would be prescribed.")

Congress's stated rationale for adopting 170(e) and its emphasis on preventing abuse by high net-worth individuals and claiming a double benefit on appreciated inventory provides important context behind the regulation.

Notably absent from the legislative history is any intent to limit charitable contribution deductions to inventory that was acquired in the current year. Current year inventory is not even mentioned in the legislative history. As the title of the section confirms, the purpose of the regulation is to instruct the taxpayer how to value the contribution so as not to allow basis for the

---

[7] Indeed, the emphasis in the regulations on treatment of individuals, not corporations, further evidences Congress's goal of curtailing abuse by individuals.

17

86133982;3

appreciated value of property from a prior year, and only to allow the current year costs. This is, simply put, all that Reg. §1.170A-1(c)(4) requires, and is not an issue in this case.

**C.**     **The IRS is Attempting to Use This Action to Audit Plaintiff's Original Tax Return**

Although not responsive to Plaintiff's Motion, Plaintiff wishes to correct some of the material misrepresentations in the Opposition that relate to discovery.

First, Plaintiff has attempted to work collaboratively with Defendant for quite some time to narrow the issues before the Court and attempt to resolve the matter, but Defendant's recent arguments reveal that it has no intention of cooperating in this matter. Defendant has made clear that it is attempting to put in place as many roadblocks as possible to avoid paying out the refunds (including refunds that have already been approved by the Congressional Joint Committee on Taxation and are being improperly withheld by Defendant, as discussed above).

Plaintiff granted a courtesy adjournment of the hearing on the Motion in March, and Defendant then issued discovery requests on April 6, 2026, solely to set up a pretext for requesting an adjournment of the hearing scheduled for April 14, 2026, and asked Plaintiff to respond to irrelevant, burdensome and extraneous discovery requests. Defendant then asserts in its Opposition – disingenuously – that Plaintiff has not responded to Defendant's discovery requests, as if they have been sitting unanswered for some time.

Finally, the discovery requests simply represent an attempt to conduct a re-audit of the Plaintiff's original tax return, years after the statute of limitations has lapsed, apparently to penalize the Plaintiff for seeking to recover money it is rightfully owed based on facts that are not relevant to the issues in this case. This cannot be upheld. Defendant has had ample opportunity to audit the Plaintiff and consciously chose not to seek this same information during its own audits. Plaintiff

18

86133982;3

was audited by the Defendant in the years leading up to these periods, as well as the two subsequent tax periods, and in their customary examination of the charitable contribution deductions, Defendant requested routine documentation to verify the amounts reported, and generally accepted the documentation provided. Further, Plaintiff extended the statute of limitations for these periods multiple times at the request of Defendant, so Defendant had ample time to audit these returns while the statute of limitations was open.

The facts and documents requested in discovery are not relevant to the two issues in this case—the applicability of the doctrine of election and whether the Plaintiff must have purchased the inventory in the same tax year of the donation.  Defendant now claims it needs to conduct discovery to search for facts that do not relate to these issues, solely in an attempt to try to defeat summary judgment.  However, these discovery requests, in addition to being untimely and prejudicial, would never produce any ultimate change in the amount of tax due based on the existence of net operating losses and other tax attributes.

To be eligible for Rule 56(d) relief to seek discovery after Plaintiff filed its Motion, Defendant must: (1) identify the alleged evidence, (2) how they would preclude summary judgment, and (3) why that party had not previously obtained such evidence. Defendant consciously chose not to seek this evidence years ago, and this evidence would not lead to any information that would be relevant to this case and would only serve to prejudice the rights of Plaintiff. Defendant had three years to audit the original tax return and request such information, and then multiple years after that based on Plaintiff's agreeing to extend the statute of limitations, but never did so until the night before the due date for Defendant to file its Response to Plaintiff's Motion.

19

86133982;3

Now that the statute of limitations has closed, Defendant asks the court to hold summary judgment in abeyance while it conducts discovery to get information it forfeited the right to obtain through normal audit channels. Granting Rule 56(d) relief would reward Defendant for failing to conduct an audit through its administrative procedures, would permit Defendant a second chance to conduct that audit through discovery after the statute of limitations has closed, and would not lead to the discovery of anything relevant to the case.

Defendant's Rule 56(d) affidavit further does not support the relief sought. "We have interpreted the rule [56(d)] as requiring that 'a party seeking further discovery in response to a summary judgment motion submit an affidavit specifying, for example, what particular information is sought; *how, if uncovered, it would preclude summary judgment*; and why it has not previously been obtained.'" *Fenter v. Mondelez Glob., LLC*, 574 F. App'x 213, 219 (3d Cir. 2014) (emphasis added) *quoting Dowling v. City of Phila.,* 855 F.2d 136, 139–40 (3d Cir. 1988). Defendant's affidavit does not specify how discovery would preclude ruling on Plaintiff's Motion. In fact, the discovery sought is not even relevant to the legal issues set forth in the Motion.

Finally, the Defendant's claim that it has an absolute right to examine every item on the refund claim is entirely baseless. Defendant's Notices of Disallowance of the refund claims assert only that the claims are barred by the doctrine of election, and that the Plaintiff has not demonstrated that the inventory was current inventory under Defendant's reading of Reg. §1.170A-1(c)(4). As Plaintiff asserted in the Motion, neither constitutes proper grounds for denial of the refund claim, and these are the only two issues in this case. Defendant has never raised this issue in this case.

86133982;3

Defendant now alleges that if it loses on both of these issues, it is nonetheless entitled to conduct a fishing expedition to search for other errors in the Plaintiff's tax return (and – to add insult to injury – these are items that were unchanged in the amended tax returns from Plaintiff's original tax return). This is not the law. While a complete discussion of this issue is outside the scope of this Reply, Plaintiff submits that none of the cases cited by Defendant actually support this position and Plaintiff will fully brief this if necessary in a separate filing.

Accordingly, the Refund Claims, which this Court ruled were valid claims, were sufficient to meet the requirements of Section 170(e) and the regulations thereunder. As neither of the defenses raised by the IRS preclude the relief sought, Debtor is entitled to relief as a matter of law.

## Conclusion

For all of the reasons set forth above, Plaintiff respectfully requests that the Court (i) enter judgment requiring the Defendant to immediately turn over and deliver to Debtors the Refunds plus any accrued interest thereon, and/or any other amount determined to be due to Debtors by this Court; (ii) enter judgment against Defendant for unjust enrichment and award Plaintiff restitution damages on account of Defendant's unjust enrichment; (iii) find and declare that the judicial doctrine of election does not apply to the Refund Claims; (iv) award Plaintiff prejudgment interest at the applicable statutory or otherwise legally applicable interest rate; (v) award Plaintiff costs and expenses of this suit; and (vi) such other relief as the Court deems just.

86133982;3

Dated: April 10, 2026

Respectfully submitted,

**AKERMAN LLP**

By: */s/ Steven R. Wirth*

Steven R. Wirth, Esq.
Email: steven.wirth@akerman.com
Raye C. Elliott, Esq. (admitted *pro hac vice*)
Email:  raye.elliott@akerman.com
401 East Jackson Street, Suite 1700
Tampa, Florida 33602
Telephone: (813) 223-7333
Facsimile: (813) 223-2837

and

Peter O. Larsen, Esq. (admitted *pro hac vice*)
Email: peter.larsen@akerman.com
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
Telephone: (904) 798-3700
Facsimile:  (904) 798-3730

and

Stefi George (admitted *pro hac vice*)
Email: stefi.george@akerman.com
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Telephone: (212) 880-3800
Facsimile:  (212) 880-8965

*Counsel for the Plan Administrator*

22

86133982;3